IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CATHY McCLEASE, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 08-1673 |
| | : | |
| COMMISSIONER of SOCIAL SECURITY, | : | |
| Defendant. | : | |
| | : | |

**Memorandum**

YOHN, J.                                                                October 28, 2009

Cathy McClease appeals the denial of her claim for Social Security Disability Insurance benefits ("DIB") and Supplemental Security Income ("SSI") by the Commissioner of Social Security. She seeks judicial review pursuant to 42 U.S.C. § 1383(c)(3) and § 405(g) of the Social Security Act. I referred the matter to a magistrate judge, who submitted a report and recommendation recommending that I affirm the Commissioner's decision to deny McClease disability benefits. McClease filed objections to the report and recommendation. I conclude that the Administrative Law Judge's ("ALJ's") final determination that McClease did not have a disability and was therefore ineligible for benefits lacked substantial evidence to support it because of errors at the step two phase of the analysis. Accordingly, I will sustain the objections in part and will remand the matter to the Commissioner for further proceedings consistent with this memorandum.

## I. Factual and Procedural Background[1]

McClease is a 50-year-old woman who lives alone with her minor granddaughter.[2] (ALJ Dec. 6.) In the past, she has worked as a laborer, truck operator, canvasser, and assembler. (ALJ Dec. 6.) Now no longer engaged in substantial gainful activity, McClease claims that she is disabled as a result of her anxiety, depression, and a uterine disorder that causes severe cramping during menses. (ALJ Dec. 3.)

McClease's anxiety and depression appear to have reached clinical levels in 2000. At that time, she was hospitalized following a major depressive episode precipitated by various stressors, including her adult daughter's repeated violent behavior.[3] (R. 113.) McClease was diagnosed at that time with "MDD [Major Depressive Disorder],[4] severe [with] psychosis." (R. 151.) She testified that she has not worked since 2000. (ALJ Dec. 3; ALJ Tr. 7.) She has been receiving regular mental health treatment, including therapy and medication, since 2001. (ALJ Dec. 4.) In February 2005 she was briefly hospitalized for the aftereffects of an episode of poly-substance abuse. There is no evidence of substance use since 2005. (ALJ Dec. 5.) In December 2005 she sought hospital treatment for stroke-like symptoms that, according to physicians, were most likely due to anxiety. (*Id.*) McClease's adult daughter's violent behavior has continued to be a

---

[1] Except where otherwise noted, the court derives this recitation of the facts from the June 29, 2006, decision of the Administrative Law Judge ("ALJ Dec."), found on pages 20-26 of the record; from the transcript of the June 6, 2006, hearing before the ALJ ("ALJ Tr."), found on pages 693-730 in the record; and from medical records and administrative documents in the record itself.

[2] This granddaughter was ten years old at the time of the hearing before the Administrative Law Judge in June 2006. (R. 697.) She is now around thirteen years old.

[3] This daughter is the mother of the granddaughter who currently resides with plaintiff. (R. 697.)

[4] *See Psychiatric Dictionary* 427 (Robert Jean Campbell ed., 7th ed. 1996).

2

significant source of McClease's anxiety. (ALJ Dec. 4-5.) McClease's anxiety symptoms decrease when her daughter, who has been "in and out of jail," is incarcerated. (ALJ Dec. 4-5.) In early 2005, McClease obtained a protection from abuse order against her daughter, but in August 2005 McClease and her daughter were involved in another altercation at McClease's house. (ALJ Dec. 4-5.) McClease testified in June 2006 that she no longer had an outstanding protection from abuse order against her daughter because she "can't afford it," but that the August 2005 incident was the last time her daughter came to McClease's home. (ALJ Tr. 11, 13.) McClease claims that her anxiety causes concentration and memory impairments, nervousness when she is around "too many people," and occasional insomnia, loss of appetite, and panic attacks. (ALJ Dec. 4-5.)

McClease also has a history of uterine problems. From as early as 1995 until 2004, McClease saw Dr. Aaron Hasiuk, M.D., to treat her heavy menstrual bleeding, clotting, and cramping that at times, according to Dr. Hasiuk's reports, left her "doubled over" in pain. (R. 192-93, 460, 585.) Dr. Hasiuk performed two surgeries in May and August 2004 in an attempt to alleviate these symptoms. (R. 570-71, 564-65.) However, in October 2004 Dr. Hasiuk noted that it was "impossible to do the [surgeries] properly both times" and that McClease continued to experience heavy bleeding seven days out of the month, accompanied by "severe cramping." (R. 460.) At that point Dr. Hasiuk prescribed Percocet and recommended a hysterectomy. (*Id.*) McClease has testified that the two surgeries were ineffective and that her uterine symptoms have not improved significantly since October 2004. (ALJ Tr. 18-21.) However, the record does not contain any documentation of further surgical or other treatment for this condition. (ALJ Dec. 3.) McClease testified at the hearing that she chose not to undergo a hysterectomy because she felt her sister had been "not the same" after undergoing a hysterectomy. (ALJ Tr. 21.)

McClease has filed two prior claims for DIB and SSI, both of which were denied. (ALJ Dec. 1.) She filed her first claim on July 17, 2000, following her initial hospitalization for depression, claiming disability as a result of depression and migraines. (R. 276-82.) The ALJ issued an adverse decision on December 10, 2001 and review was denied on November 8, 2002. (R. 282, 288.) McClease filed her second claim in January 2003, and the ALJ denied this claim in April 2004.[5] (ALJ Dec. 1.) There is no evidence that she requested further review by the Appeals Council. (ALJ Dec. 1.)

McClease then filed the instant claim on October 7, 2004, alleging disability beginning May 11, 2004.[6] (ALJ Dec. 1.) The Commissioner initially denied this claim in February 2005. (ALJ Dec. 1.) McClease requested a hearing, which took place before an ALJ on June 6, 2006. (ALJ Dec. 1.) McClease was represented at this hearing. (*Id.*) The ALJ found that McClease was not disabled and issued an adverse decision on June 29, 2006. (R. 18.) McClease requested review by the Appeals Council, which the Council denied on January 4, 2007. (R. 8-10).

On April 14, 2008, McClease filed in this court a Request for Review of the ALJ's decision. McClease's claim was randomly assigned to a magistrate judge for a report and recommendation. The magistrate judge conducted oral arguments on July 15, 2009. In his report and recommendation, the magistrate judge concluded that the ALJ's decision was supported by substantial evidence and recommended that this court affirm the Commissioner's decision to deny benefits to plaintiff. McClease has filed objections to the magistrate judge's report, and the Commissioner has filed a response to McClease's objections.

---

[5] The substance of the second claim is not in the record before me.

[6] McClease's earning record shows that she had sufficient quarters of coverage to remain insured through December 31, 2005. She must therefore establish disability on or before that date. (ALJ Dec. 1.)

I conclude that the ALJ did fail to consider some evidence relevant to McClease's uterine symptoms and that this failure calls into question her ultimate conclusion that McClease is able to perform work in the national economy. Accordingly, I will remand the case to the ALJ for further consideration.

## II. Legal Standard

### A. Standard of Review

A district court reviews *de novo* the parts of the magistrate judge's report and recommendation to which either party objects. 28 U.S.C. § 636(b)(1) (2006). The district court may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. *Id.*

In contrast, the district court may only review the ALJ's final decision in order to determine "whether that decision is supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). This standard of review is deferential. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185,1190 (3d Cir. 1986). "Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hartranft*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552 (1988)). The court may not "weigh the evidence," *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), and "will not set the Commissioner's decision aside if it is supported by substantial evidence, even if [the court] would have decided the factual inquiry differently," *Hartranft*, 181 F.3d at 360.

In making this determination, however, the court must consider "the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding." *Monsour*, 806 F.2d at 1190. "A single piece of evidence will not satisfy the substantiality test if the Secretary ignores,

or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

**B. Standard for Disability Determination**

To qualify for DIB or SSI disability insurance payments, a claimant must have a disability. 42 U.S.C. §§ 423(a)(1)(E) (DIB), 1382(a)(1) (SSI).[7] A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). A person has a disability when the person's impairment or combination of impairments render him or her unable either to return to previous work or, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

When evaluating a claim for disability benefits, the Commissioner applies a five-step sequential analysis: (1) whether the claimant worked during the alleged period of disability, (2) whether the claimant has a "severe medically determinable physical or mental impairment," (3) whether the impairment meets the requirements of a "listed impairment" found in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"), (4) whether the claimant can continue to perform "past relevant work," and (5) whether the claimant can perform "other work" in the national economy. 20 C.F.R. §§ 404.1520(a)(4) (2008), 416.920(a)(4) (2008);[8] *Sykes v. Apfel*, 228 F.3d

---

[7] Because the relevant statutory language is substantially identical for DIB (42 U.S.C. §§ 401-434) and SSI (42 U.S.C. §§ 1381-1383f), for the remainder of this opinion I will cite only to the provisions for DIB.

[8] Because the relevant regulatory language is substantially identical for DIB (20 C.F.R. Part 404) and SSI (20 C.F.R. Part 416), for the remainder of this opinion I will cite only to the

259, 262-63 (3d Cir. 2000). The claimant bears the burden of proof at steps one, two, and four.[9]
If the claimant satisfies these requirements, the burden of production shifts to the Commissioner
to show that the claimant is capable of performing other work available in the national economy.
*Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

The severity test at step two is a "*de minimis* screening device to dispose of groundless
claims." *McCrea v. Comm'r of Soc. Sec.,* 370 F.3d 357, 360-61 (3d Cir. 2004) (quoting *Newell v.
Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003)). The ALJ will generally find a condition
to be severe if it has any significant effect on a claimant's ability to work. *Newell*, 347 F.3d at
546-47. However, an impairment will not qualify as "severe" if it does not "significantly limit
[the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).
As the Third Circuit has explained, although the standard for substantial evidence at step two is
the same as at all other steps, "because step two is to be rarely utilized as basis for the denial of
benefits . . . its invocation is certain to raise a judicial eyebrow." *McCrea*, 370 F.3d at 361.

At step three, the ALJ considers whether any of the claimant's credibly established
impairments, alone or in combination, meet or equal any of the impairments listed in Appendix
1. If so, the claimant will be automatically entitled to benefits. *Id.* § 404.1520(a)(4)(iii).

If the claimant's impairment does not meet or equal a listed impairment, the
Commissioner must assess at step four the claimant's Residual Functional Capacity ("RFC"), a
measure of what the claimant can do in a work setting despite the claimant's physical and mental

---

provisions for DIB.

[9] Technically, neither party bears the burden of proving step three because "step three
involves a conclusive presumption based on the listings." *Sykes*, 228 F.3d at 263 n.2. *But see
Montgomery v. Comm'r of Soc. Sec.*, No. 07-4500, 2009 U.S. Dist. LEXIS 54976, at *10-12 n.3
(D.N.J. Mar. 5, 2009) (criticizing *Sykes* and holding that the claimant also bears the burden of
proof at step three).

limitations. *Id.* §§ 404.1520(e), 404.1545(a)(1). When assessing RFC, the Commissioner must consider the combined effect of all of a claimant's impairments of which there is objective medical evidence, including any that, considered alone, would not be considered "severe." *Id.* § 404.1545(a)(2); *Burnett v. Comm'r of Soc. Sec.,* 220 F.3d 112, 122 (3d Cir. 2000). The Commissioner must consider not only a claimant's ability to do specific job-related tasks, but also her ability to perform these tasks on a "regular and continuing basis." 20 C.F.R. § 404.1545(b), (c). Because the RFC determination may ultimately be dispositive of an individual's social security claim, the Commissioner need not adopt any particular doctor's or expert's opinion on a claimant's RFC. *Id.* § 404.1527(e).

At step four, the ALJ compares the claimant's RFC to the requirements of the claimant's past jobs in order to determine whether the claimant can return to that previous work. If not, the ALJ moves on to step five, at which point he considers the claimant's RFC, physical ability, age, education, and work experience in order to determine whether the claimant can perform any jobs in the national economy. *Id.* § 404.1520(g).

When a claimant's alleged disability is based in part on pain or other subjective symptoms,[10] the ALJ must engage in a separate, two-step analysis to determine the severity of those symptoms. *See id.* § 404.1529(b), (c). The severity of the claimant's symptoms may be relevant to the ALJ's decision at steps two and three and during the RFC determination. *Id.* § 404.1529(d); *see also Newell*, 347 F.3d at 547-48 (step two); *Burnett,* 220 F.3d at 121-23 (RFC).

---

[10] In the Social Security context, the term "symptom" is a term of art that refers to a claimant's own description or experience of an impairment. *See* 20 C.F.R. §§ 404.1528(a), 404.1529.

For the purposes of clarity, I will refer to the first part of the two-step symptom analysis as the "impairment analysis." At this step, the Commissioner must first determine whether the claimant has a "medically determinable impairment that could reasonably be expected to produce" the claimant's symptoms. 20 C.F.R. § 404.1529(b). The claimant must present objective "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of" such an impairment. *Id.*[11] This analysis, however, "does not involve a determination as to the intensity, persistence, or functionally limiting effects of [a claimant's] symptoms." *Id.*

I will refer to the second part of the two-step symptom analysis as the "intensity and persistence analysis." At this step, the Commissioner must consider "all of the available evidence," including the claimant's testimony and other non-medical evidence, in order to determine the intensity and persistence of the symptoms caused by the claimant's impairment or impairments and the degree to which those symptoms interfere with the claimant's ability to work.[12] *Id.* at § 404.1529(c). Although the claimant's alleged symptoms must be "consistent" with the objective medical evidence and other evidence, the Commissioner "will not reject [a claimant's] statements about the intensity and persistence of . . . pain or other symptoms or about the effect [those] symptoms have on [a claimant's] ability to work solely because the available objective medical evidence does not substantiate [those] statements." *Id.* § 404.1529(c)(2).

---

[11] This language is taken directly from the statutory definition of disability. *See* 42 U.S.C. § 423(d)(5)(A).

[12] Non-medical evidence can include: the claimant's daily activities; the circumstances of the claimant's symptoms, including location, duration, frequency, intensity, and precipitating and aggravating factors; medication and other treatments for the symptoms; and medical and non-medical measures taken to relieve the symptoms. *Id.* § 404.1529(c)(3).

**III. Discussion**

**A. ALJ's Application of Standards to McClease**

In her decision, the ALJ performed the requisite five-step analysis. At step one, the ALJ determined that McClease had not engaged in substantial gainful activity during the relevant period. (ALJ Dec. 3.) At step two, the ALJ found that plaintiff suffered from anxiety, depression, and a uterine disorder. (*Id.*) The ALJ found that, although McClease's anxiety and depression were "severe," her uterine "symptoms have abated for the most part since undergoing endometrial ablation in August 2004 as she has required minimal, if any, treatment for this condition since that time," and that her uterine condition was therefore not "severe." (*Id.*)

At step three, the ALJ determined that McClease's anxiety and depression did not meet or equal the listed impairments found in Appendix 1. (ALJ Dec. 3-4.) The ALJ therefore went on to assess McClease's RFC.

In her RFC determination, the ALJ considered McClease's complaints of mood fluctuation, poor memory and concentration, unease around other people, and preoccupation with worry over her daughter. The ALJ also noted that McClease claimed to suffer from "bad cramps, clotting and heavy periods for seven days." (ALJ Dec. 4.) Although the ALJ determined that McClease suffered from a medically determinable impairment that could reasonably be expected to give rise to her complaints, the ALJ found that McClease's testimony as to the "intensity, duration and limiting effects" of her symptoms was "not entirely credible" in light of other evidence in the record, including therapy notes and McClease's daily activities. (ALJ Dec. 4-6.) The ALJ also found that, even affording McClease the "benefit of the doubt" with respect to the severity of her anxiety and depression symptoms, her daily activities reflected the capacity to perform "at least self-paced, light and medium work involving simple, routine, 1-2 step tasks and

limited contact with the public and co-workers." (ALJ Dec. 4-6.) The ALJ further noted that none of McClease's treating physicians had said she could not work.

At step four, the ALJ found that McClease was unable to perform any past relevant work. (ALJ Dec. 6.) However, at step five, the ALJ found that McClease was able to perform other work, citing testimony by the vocational expert ("VE") that someone with McClease's education, age, experience, and RFC could still perform numerous available jobs in the national economy. (ALJ Dec. 7.) The ALJ therefore concluded that McClease was not disabled.

**B. Claims of Error**

McClease's objections concern the ALJ's decisions at steps two and five. McClease first argues that the ALJ's step-two determination that her uterine disorder was not severe was unsupported by substantial evidence and in conflict with the applicable standards for severity at that step.

Regarding the ALJ's RFC calculation, McClease objects that the ALJ improperly considered McClease's daily activities in calculating McClease's RFC, as those activities were "not indicative of an ability to work full time on a regular, sustained basis, . . . eight hours a day, five days a week." (Pl.'s Obj. 5.) McClease also objects that another part of the vocational expert's testimony, in which the VE stated that someone with McClease's alleged symptoms would be "unemployable," conflicted with the ALJ's finding that, even affording McClease full credibility with respect to her cognitive and social impairments, McClease had still failed to prove that she was unable to work.

Finally, McClease objects that the ALJ mischaracterized the record by focusing on mental health treatment notes reflecting periods of relatively mild anxiety—such as when McClease's

daughter is in prison—while overlooking the fact that "these periods are generally short-lived." (Pl.'s Obj. 7.) McClease argues that this mischaracterization caused the ALJ to improperly discount McClease's own testimony that her anxiety symptoms render her incapable of "concentrating for long periods of time." (*Id.* (quoting ALJ Tr. 10).)

Because the merits of McClease's first objection are sufficient to warrant remand, the court need not reach the merits of her second and third objections.

## C. Did the ALJ Err in Determining that McClease's Uterine Condition Was "Not Severe" at Step Two?

The following is the ALJ's step two discussion of McClease's uterine impairment:

> The medical evidence also demonstrates a non-severe uterine disorder, diagnosed as endometriosis, which is characterized mainly by cramping and heavy menses. Claimant's symptoms have abated for the most part since undergoing endometrial ablation in August 2004 as she has required minimal, if any, treatment for this condition since that time (Exhibit B-11F).

(ALJ Dec. 3.)

I note that the records that the ALJ cites in fact reflect diagnoses of "chronic severe menometrorrhagia" and "very thick-walled internal uterine septation." (R. 570, 564.) There was no apparent indication in Exhibit B-11F that any doctor diagnosed McClease with endometriosis. The medical records do, however, reflect that McClease suffered from cramping and heavy menses. (R. 574, 580, 585.) A septate uterus is one whose cavity is divided into two parts by a wall of tissue. *Dorland's Illustrated Medical Dictionary* 2041 (31st ed. 2007). Menometrorrhagia is "excessive and prolonged uterine bleeding occurring at irregular, frequent intervals." *Id.* at 1152. By contrast, endometriosis is a condition in which uterine endometrial tissue "occurs aberrantly in various locations in the pelvic cavity or some other area of the body." *Id.* at 626.

McClease argues that the ALJ's conclusion that her uterine condition was non-severe was unsupported by substantial evidence because: (1) the ALJ improperly failed to consider, or to address the weight of, therapist notes indicating that her symptoms persisted after August 2004, (2) the absence of evidence that she sought further treatment after October 2004 does not support a finding that her symptoms were not severe, and (3) the ALJ improperly used a stricter standard for severity than the *de minimis* standard required by the law and failed to resolve all "reasonable doubts" as to severity in her favor. *See Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546-47 (3d Cir. 2003).

Because McClease's primary complaint was of pain, she was required at step two to (1) provide sufficient objective medical evidence to show that she suffered from a disorder that could reasonably be expected to produce her pain; and (2) prove, through medical and/or non-medical evidence, that she actually experienced sufficiently intense pain as to interfere with her ability to work for a period of sufficient duration. 20 C.F.R. §§ 404.1529(b) and (c), 404.1520, 404.1521. I find that the ALJ's decision was based on the second step of this analysis and therefore conclude that the ALJ was required to consider relevant non-medical evidence that supported McClease's claims of continued pain. Because the ALJ failed to do so, her decision was not based on substantial evidence.

**1. The ALJ Failed to Consider All of the Evidence Relevant to McClease's Symptoms**

McClease argues that the ALJ erred in failing to consider several notes of McClease's mental health treatment providers, the Family Service Association of Bucks County Behavioral Health Program, which corroborated her complaints of continued pain. The Commissioner argues that the ALJ properly failed to consider this evidence because it is not the kind of "medical

evidence" required at step two. Although I agree that this evidence is not "objective medical evidence," I conclude that the ALJ was nonetheless required to consider it.

Exhibit B-11F, the only piece of evidence that the ALJ cites in her step-two analysis, is a 69-page collection of medical records from Lower Bucks Hospital, covering the period between May 19, 2004 and December 16, 2005. (R. 3.) These records include the May 2004 and August 2004 operative reports in which Dr. Hasiuk described his observations of McClease's uterine abnormalities. (R. 564-65, 570-71.) The August post-operative report includes a note that the surgeon had been unable to complete the second operation and that McClease may still require a hysterectomy, but expresses hope that the surgery would give McClease some relief. (R. 564-65.) All of the hospital records from dates after that report concern treatment for other conditions and none of them appear to contain any reference to McClease's uterine condition. (R. 510-79.) Since the most recent medical record discussing McClease's uterine condition expresses only hope—not expectation—that her symptoms would improve, the ALJ apparently based her conclusion that those symptoms improved entirely on the absence of any record of further treatment.

The ALJ also had in the record before her Exhibit B-4F, labeled "Medical Records - Aaron Hasiuk, M.D. dated 4/2/04 - 10/12/04," which includes a note from a follow-up visit on October 12, 2004. (R. 3, 460.) This note does not appear in Exhibit B-11F, probably because the visit did not take place at Lower Bucks Hospital. In the note, Dr. Hasiuk stated that McClease had a "septated uterus," that it was "impossible to do the endometrial ablation properly both times," and that McClease was "still having a seven day period, sometimes heavy, associated with severe cramping," for which he prescribed Percocet. (R. 460.) Dr. Hasiuk also wrote that

14

McClease "will" return in three months and that "[a]t that time, she might want to consider a hysterectomy." (*Id.*) Because the ALJ did not refer to this note, it is unclear whether she considered it in her assessment of McClease's condition. However, because McClease has not raised the issue in her objection to the report and recommendation, I will assume for the purpose of argument that the ALJ did consider this note.

McClease objects that the ALJ failed, in assessing her uterine symptoms, to refer to the notes of McClease's mental health therapy providers. These notes were also in the record before the ALJ (R. 3) and contain occasional contemporaneous references to McClease's continued complaints of uterine pain. For example, in September 2004, Dr. London-Barrett, D.O.,[13] and a Ph.D. psychologist both wrote that McClease was still experiencing pain and bleeding; the psychologist also wrote that McClease planned on meeting with another gynecologist. (R. 401-02, 414.) In November 2004, the same psychologist wrote that McClease was taking hormones for her uterine symptoms, but that McClease was still bleeding "dark clots." (R. 392, 398.) The psychologist also wrote "[c]all the Dr. for another appt . . . ." (R. 398.) In February 2006, Dr. London-Barrett again wrote that McClease had severe menstrual cramps and that in "May [20]05" McClease had undergone further uterine surgery to remove pre-cancerous cysts.[14] (R. 495.) In April 2006, another therapist wrote that McClease "would like to discuss possibility of having a hysterectomy." (R. 603.) The contents of these notes are in conflict with the ALJ's

---

[13] The records of the Family Services Association of Bucks County describe Dr. London-Barrett as McClease's psychiatrist. (*See, e.g.,* R. 444.)

[14] The record contains no other evidence of this surgery.

conclusion that McClease's symptoms had "abated for the most part" after the August 2004

surgery; however, the ALJ neither mentioned them nor explained her basis for rejecting them.

As at other steps, at step two an ALJ's decision is supported by substantial evidence when

the ALJ has considered all of the evidence before her and explained why she rejected any

relevant evidence that was in conflict with her ultimate decision. *See Cotter v. Harris*, 642 F.2d

700, 704, 707 (3d Cir. 1981) (stating general rule); *Newell,* 347 F.3d at 547-48 (applying general

rule at step two). This duty applies not only to medical evidence but also to relevant non-medical

evidence. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000). If the ALJ does not

provide reasons for rejecting certain evidence, "the reviewing court cannot tell if significant

probative evidence was not credited or simply ignored," *Cotter*, 642 F.2d at 705, and the ALJ's

"bare conclusion is beyond meaningful judicial review." *Burnett*, 220 F.3d at 119 (quoting

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)).

The Commissioner argues that the mental health treatment notes were not "medical

evidence" and therefore not competent evidence of a uterine impairment. The Third Circuit has

indicated that the ALJ need not provide an explanation for rejecting evidence that is not

"pertinent or probative," or is overwhelmingly outweighed by the rest of the record. *Johnson v.

Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008). McClease argues in response that her

mental health treatment providers' notes are medical evidence as they "appear in medical records

and pertain to [her] uterine disorder."[15] (Pl.'s Obj. 2.)

───────────────────

[15] As a preliminary matter, I note that there are two different "medical evidence"
requirements that are relevant at step two. First, McClease was required to establish her uterine
impairment through "*medical evidence consisting of signs, symptoms, and laboratory findings*."
20 C.F.R. § 404.1508 (emphasis added). Moreover, if a claimant's subjective symptoms, such as
pain, are relevant at step two, the claimant must present "*objective* medical evidence," consisting

Doctor's notes that are "simply a recitation of [claimant's] own subjective complaints" and uncorroborated by physical examination are not objective medical evidence. *Hatton v. Comm'r of Soc. Sec.*, 131 F. App'x 877, 879 (3d Cir. 2005) (addressing definition of "objective medical evidence" in the context of weighing conflicting medical evidence); *Clements v. Apfel*, 76 F. Supp. 2d 599, 603 (E.D. Pa. 1999) (same). As discussed *supra*, objective medical evidence must be based on "medical signs and laboratory findings." 20 C.F.R. § 404.1529(a). There is no indication in the notes that McClease's psychiatrist or therapists examined her in a manner that would produce objective evidence of a uterine disorder.

However, the ALJ's failure to discuss the therapy notes cannot be explained by the fact that the notes were not objective medical evidence. The ALJ's step-two determination regarding McClease's uterine disorder was not based on McClease's failure to prove a "medically determinable impairment" that was reasonably capable of producing her symptoms but on a determination that the symptoms themselves had abated.

In her opinion, the ALJ wrote that the "medical evidence" demonstrated a uterine disorder that was "characterized . . . by cramping and heavy menses." (ALJ Dec. 3.) In her RFC analysis, the ALJ further wrote that McClease's "medically determinable impairment (sic) could

---

of "*medical signs and laboratory findings*," indicating an impairment capable of producing those symptoms. *Id.* § 404.1529(a) (emphasis added). Although the wording is slightly different across these two provisions, the parties do not appear to make a distinction between "medical evidence" and "objective medical evidence." However, the court in *Clements v. Apfel*, 76 F. Supp. 2d 599 (E.D. Pa. 1999), which the Commissioner cites in his brief in support of his argument that the therapy notes are not objective medical evidence, does appear to make such a distinction. *Id.* at 602-03 (even though doctors' opinions were not based on "objective medical evidence," they were still "medical" testimony that the ALJ was required to explicitly consider and evaluate). Because the standard for "objective medical evidence" is more demanding than for "medical evidence" in general, *see id.* § 404.1512(b), I will focus here on objective medical evidence.

reasonably be expected to produce" her alleged physical and mental symptoms. (ALJ Dec. 4.) The ALJ based these conclusions on medical evidence in the record, including objective medical evidence: the exhibit that the ALJ cited, B-11F, was "objective medical evidence" and included both descriptions of medical signs—such as Dr. Hasiuk's observations of McClease's uterus and its physical abnormalities—and surgical pathology laboratory reports.[16] (R. 3, 564-65, 570-71, 587.) Thus, according to the ALJ's own language, McClease provided sufficient medical evidence to prove an impairment both at step two and for the purposes of the symptom analysis described in Section 1529. *See* 20 C.F.R. §§ 404.1508 (proof of impairment), 404.1529.

The ALJ's decision that McClease's uterine disorder was non-severe was based on her finding that McClease had required "minimal, if any" treatment for her uterine disorder since August 2004 and her conclusion from that fact that her symptoms had "abated for the most part since undergoing" the August 2004 operation. (ALJ Dec. 3.) Because this is essentially a determination of the intensity and persistence of McClease's symptoms, the ALJ was required to base her conclusion on a consideration of "all of the available evidence," (including the plaintiff's complaints), not only on medical evidence. 20 C.F.R. § 404.1529(c)(1), (3). *Cf. Newell,* 347 F.3d at 547-48 (ALJ erred at step two by discrediting claimant's testimony about symptoms simply because the testimony was uncorroborated by objective medical evidence)*; Zaccaria v. Comm'r of Soc. Sec.*, 267 F. App'x 159, 163 (3d Cir. 2008) (ALJ entitled to find at step two that a claimant's impairment was not severe during the relevant time period "[a]bsent either contemporaneous medical records *or credible lay testimony corroborative of [claimant's*

---

[16] Although the ALJ did not cite it, Dr. Hasiuk's October 2004 treatment note is also objective medical evidence as Dr. Hasiuk therein states that he had not been able to perform the operations properly and that McClease's uterus was still physically abnormal. (R. 460.)

*complaints]*." (emphasis added)). Moreover, the ALJ was not to reject McClease's statements about the intensity and persistence of her pain "solely because the available objective medical evidence [did] not substantiate [her] statements."[17] *See* 20 C.F.R. § 404.1529(c)(2).

McClease's mental health treatment notes were relevant as to the persistence of McClease's uterine symptoms. Although they are not objective medical evidence or medical opinion evidence, they contemporaneously record McClease's subjective complaints of pain; moreover, McClease made these complaints in a context in which she may have had less of an incentive to exaggerate her pain than during a hearing on a DIB/SSI claim. *Cf. Burnett*, 220 F.3d at 122 (at step four, ALJ erred in failing to discuss husband's and neighbor's testimony

---

[17] The Commissioner's brief may also be read to suggest that, even if a claimant does not need to provide "objective medical evidence" of severity, she must still provide "medical evidence" of it. However, the ALJ never indicated that she had insufficient medical evidence of the ongoing severity of McClease's condition. For example, although the ALJ had the discretionary authority to seek a consultative medical examination that would have provided additional medical evidence, *see* 20 C.F.R. § 404.1519, and will "normally" seek such an examination when there is insufficient evidence to determine the "current severity" of a claimant's condition, *see id.* § 404.1519a(b)(5), there is no indication that she considered doing so. *Cf. Newell,* 347 F.3d at 548-49 (where there was no medical evidence in the record showing when claimant's impairment began, ALJ was required to consult medical advisor to determine onset date and to consider non-medical evidence of the limiting effects of the impairment during that period). Instead, she appears to have interpreted the absence of further treatment notes as affirmative evidence that McClease's symptoms improved and concluded that further medical examination was unlikely to reveal a significant impairment.

However, because McClease has apparently not produced any further treatment records (Def.'s Resp. to Pl.'s Obj. 4), this issue may be relevant on remand and I will briefly address the Commissioner's argument. The only arguably supportive authority I find is 20 C.F.R. § 404.1512(c), which states that a claimant "must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled." It appears, however, that this rule is modified by § 404.1529, which concerns situations in which claimants' alleged limitations arise from pain or other symptoms. Because McClease primarily claims that her uterine disorder limits her by causing pain, § 404.1529, not § 404.1512, controls here. Section 404.1529(c)(3) lists other medical evidence as just one of many types of evidence, aside form "objective medical evidence," considered in determining intensity and persistence of pain.

corroborating claimant's complaints of pain, as this testimony was relevant to the credibility of claimant's own testimony). They also suggest that McClease did seek treatment for her uterine condition at some point after October 2004, despite her failure to present any records of such treatment to the ALJ. (*See* R. 401, 392, 399 (stating that McClease planned to see another gynecologist).)

Although there is a long period of time during which the treatment notes do not mention McClease's uterine disorder (Def.'s Resp. to Pl.'s Obj. 2 n.2),[18] it is the ALJ's duty, not the court's, to decide whether this means McClease was not experiencing symptoms at that point. The ALJ was not required to credit this evidence or to infer from it that McClease's symptoms persisted throughout the relevant time period, but was required to at least discuss it before she rejected it in favor of conflicting evidence.[19] *See Clements*, 76 F. Supp. 2d at 604 (ALJ required to consider doctor's note that mental health impairment was "associated with [claimant's] response to treatment for the complaint of chronic joint pain" as evidence of claimant's pain, even though doctor's opinion was based entirely on claimant's subjective complaints). Since the ALJ never mentioned the notes or their contents, it is unclear whether "significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705.

_____

[18] McClease argues that this gap exists because, at that time, she was seeing a therapist who did not discuss McClease's physical health in her notes. (Pl.'s Br. 8.)

[19] Although the Commissioner may decline to discuss evidence that is clearly outweighed by "overwhelming" contrary evidence in the record, particularly medical evidence, *see Johnson*, 529 F.3d at 204, the evidence that contradicts McClease's testimony is not "overwhelming." The ALJ based her conclusion that McClease required minimal treatment after August 2004 entirely on the absence of follow-up records, not on the kind of affirmative medical evidence seen in *Johnson*.

**2. The ALJ's Failure to Discuss All Relevant Evidence May Have Been Prejudicial**

The Commissioner argues that, even if the ALJ erred at step two in finding McClease's uterine disorder non-severe, she nonetheless adequately considered McClease's uterine symptoms in her RFC determination. The ALJ's opinion, however, does not support this argument.

Where the ALJ finds at step two that a claimant has both severe and non-severe impairments, as in this case, the ALJ must consider the combined effects of the severe and non-severe impairments during the rest of the disability determination process, including when assessing the claimant's RFC. 20 C.F.R. §§ 404.1523, 404.1545(a)(2); *Burnett,* 220 F.3d at 122. Thus, even if an ALJ erroneously determines at step two that one impairment is not "severe," the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five. However, where it appears that the ALJ's error at step two also influenced the ALJ's RFC analysis, the reviewing court may remand the matter to the Commissioner for further consideration. *See Nosse v. Astrue,* No. 08-1173, 2009 U.S. Dist. LEXIS 84944, at *45-46 (W.D. Pa. Sept. 17, 2009) ("Until the ALJ explains why plaintiff's mental conditions are not severe . . . and provides reasons for rejecting [doctor's] diagnoses and opinions, the court is unable to determine whether the ALJ's RFC determination is supported by substantial evidence.").

The Commissioner claims that the ALJ "considered Plaintiff's subjective statements to her therapist in his (sic) [RFC] analysis . . . and thus did not ignore Plaintiff's complaints of ongoing [uterine] symptoms." (Def.'s Resp. to Pl.'s Obj. 4.) However, there is no indication in the record that she did so. The ALJ's entire discussion of McClease's uterine symptoms in the

21

RFC analysis consisted of mentioning that McClease "testified that she . . . suffers from bad cramps, clotting and heavy periods for seven days" and finding that McClease's "medically determinable impairment could reasonably be expected to produce the alleged symptoms, but . . . the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible." (ALJ Dec. 4.) Although the ALJ discusses McClease's mental health treatment records at length, her discussion of them is limited to an analysis of McClease's depression and anxiety symptoms; the ALJ does not mention that these records contained notes describing McClease's uterine symptoms. (ALJ Dec.4-6.)

Because the ALJ's RFC analysis did not include further discussion of evidence relevant to McClease's uterine symptoms or an explanation of why McClease's complaints were not credible, it appears that the ALJ's conclusion here was primarily based on her conclusion at step two that those symptoms had abated. As at step two, however, the ALJ was required to consider all of the evidence of McClease's ongoing symptoms, not only her medical records. *See* 20 C.F.R. §§ 404.1529(c)(3), (d)(4), 404.1545(a)(3); *see also Williams v. Apfel*, 98 F. Supp. 2d 625, 630-31 (E.D. Pa. 2000) (ALJ erred at step four in failing to consider report from claimant's social worker describing claimant's symptoms, even though the report was not medical evidence). Where the ALJ fails to explain why she rejected non-medical evidence corroborating a claimant's subjective complaints, her finding that the claimant is "not entirely credible" is not based on substantial evidence. *See Burnett*, 220 F.3d at 122.

In the absence of a full discussion of the relevant evidence, I cannot conclude that the ALJ's RFC determination adequately took into account the effects of McClease's uterine symptoms. Moreover, because the ALJ included in her hypothetical question to the VE only a

description of McClease's RFC and omitted in that question any description of the symptoms (including the uterine disorder) on which the RFC determination was based, it appears that the VE did not specifically consider McClease's uterine symptoms when testifying that McClease could perform work that exists in significant numbers in the national economy. (ALJ Tr. 27-31.) The ALJ relied on this testimony in her ultimate decision to deny benefits. (*See* ALJ Dec. 7.) As a result, the ALJ's failure to consider all the evidence in her RFC determination calls the ALJ's overall decision into question. I will therefore remand the matter to the Commissioner for further proceedings consistent with this memorandum.

**D. Other Issues Raised by McClease**

Although the aforementioned errors cause me to remand, I will also address some of the remaining objections.

**1. Can Absence of Records of Further Treatment Be Evidence of Abated Symptoms?**

McClease objects that the ALJ improperly regarded the absence of further treatment records as evidence that McClease's symptoms had subsided. McClease appears to argue that Dr. Hasiuk's 2004 treatment note from October 2004, which states that the May and August surgeries had been unsuccessful, is "irrefutable evidence" that McClease's symptoms continued and that the ALJ could not reject Dr. Hasiuk's finding without other medical evidence that her symptoms improved. (Pl.'s Obj. 3.) *See Frankenfield v. Bowen,* 861 F.2d 405, 408 (3d Cir. 1988) ("[T]he medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence."); *Williams v. Apfel*, 98 F. Supp. 2d 625, 633-34 (E.D. Pa. 2000) (where objective medical evidence demonstrates a condition capable of producing pain, ALJ may not, solely on the basis of non-medical evidence, discredit claimant's subjective testimony).

23

Dr. Hasiuk's treatment notes do not directly contradict the ALJ's finding that McClease's symptoms abated after October 2004. Although the October 25, 2004, note recommends a hysterectomy, which implies that Dr. Hasiuk expects McClease's symptoms to continue, it does not state that those symptoms could not improve in the future. The ALJ's determination that McClease's symptoms improved was therefore not a rejection of Dr. Hasiuk's opinion or an attempt to second-guess his medical judgment. As a result, the ALJ's conclusion could have been supported by substantial evidence even if it was based entirely on non-medical evidence. Evidence of subsequent treatment can be competent non-medical evidence of the intensity and persistence of a claimant's symptoms. *See* 20 C.F.R. § 1529(c)(3)(iv) and (iv) ("Factors relevant to [a claimant's] symptoms" include medications or other treatment the claimant has used for those symptoms); *Mason v. Shalala,* 994 F.2d 1058, 1068 (3d Cir. 1993).

However, because the ALJ failed to discuss other non-medical evidence that supported McClease's testimony, McClease's apparent failure to seek further treatment for her uterine disorder is insufficient to constitute "substantial evidence" for the ALJ's decision. "A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Moreover, the ALJ failed to discuss the explanation McClease gave for the absence of subsequent records. At the hearing, McClease testified that she did not seek further treatment because Dr. Hasiuk had recommended a hysterectomy, which McClease was reluctant to undergo as a result of her sister's experience with the same procedure. (ALJ Tr. 21.) Although a claimant's mild treatment regimen or failure to seek further treatment may be substantial

24

evidence that the claimant's symptoms were not severe, the Third Circuit and the Social Security Administration have both warned that an ALJ must explicitly consider any alternate explanations the claimant may provide for the claimant's failure to seek treatment. *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2003) (citing Social Security Administration Policy Interpretation Ruling, SSR No. 96-7p, 1996 SSR LEXIS 4, at *22 (1996)); *see also Ray v. Astrue*, No. 07-04378, 2009 U.S. Dist. LEXIS 1256, at *45 (E.D. Pa. Jan. 7, 2009) (ALJ's failure to address "the non-condition related reasons underlying Ray's treatment regimen and the instances of more than moderate medication" violated his "duty to account for all evidence and explain contradictory evidence."). Because the ALJ did not mention McClease's testimony explaining her failure to seek further treatment and did not explain why she found it not to be credible (ALJ Dec. 4), it is impossible to determine whether the ALJ's finding that McClease's symptoms had abated was based on substantial evidence.

**2. Did ALJ Properly Apply *De Minimis* Standard of Severity?**

McClease objects that, in deciding that McClease's uterine condition was "non-severe," the ALJ failed to resolve in McClease's favor "[a]ny doubt" as to whether her symptoms were severe." *See McCrea v. Comm'r of Soc. Sec.,* 370 F.3d 357, 360 (3d Cir. 2004). The Commissioner responds by citing *Kirby v. Astrue*, 500 F.3d 705, 708 (8th Cir. 2007), which held that the standard for "severity" is, while generous, not a "toothless standard." The Commissioner also argues that, even if the ALJ had believed that McClease's symptoms had continued as described in Dr. Hasiuk's October 2004 note, these symptoms do not rise to the level of "severe" because McClease only suffered from them during her period and because her symptoms were controlled with medication. (D's Resp. to Pl.'s Obj. 3.)

25

As I discuss above, Dr. Hasiuk diagnosed McClease with "chronic severe menometrorrhagia," a condition characterized by frequent, excessive and prolonged uterine bleeding, and uterine septation. (R. 570, 564.) In his October 2004 note, Dr. Hasiuk stated that McClease experienced "severe cramping" for seven days out of every month, for which he prescribed Percocet and recommended major surgery. (R. 460.) Such a finding would normally, if the ALJ credited it, be sufficient to satisfy the *de minimis* severity standard applicable at step two. *See Newell*, 347 F.3d at 546 ("If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and the sequential evaluation process should continue."). The fact that Percocet stops McClease's pain "completely" does not necessarily render the impairment minimal, as there is some indication that McClease did not continue to use Percocet.[20] (ALJ Dec. 4.)

## V. Conclusion

The ALJ's finding at step two that McClease's uterine disorder was non-severe lacked substantial evidence as a result of the ALJ's failure to consider non-medical evidence that McClease's uterine symptoms continued after August 2004. This decision affected the ALJ's determination of McClease's RFC and, in turn, the final determination that McClease did not have a disability and could not receive benefits. As a result, the final decision lacked substantial

---

[20] The ALJ may, in some circumstances, consider the ameliorating effects of treatments that a claimant has not pursued but that would have enabled her to work. *See* 20 C.F.R. § 404.1530. However, the ALJ made no finding as to whether Percocet would enable McClease to work and neither party has briefed this issue. Outside of the provision found in § 404.1530, an ALJ may not conclude that an impairment is non-severe in order to punish a claimant for failing to pursue more aggressive treatment. *See Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983).

evidence to support it. Therefore, I will reject the recommendation of the magistrate judge and remand this matter to the ALJ for further consideration consistent with this memorandum.

An appropriate order follows.